## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MARJORY MUHAW,** | **CASE NO. 1:15-cv-01398-CCC-GBC** |
| | |
| **Plaintiff,** | **(CHIEF JUDGE CONNER)** |
| | |
| **v.** | **MAGISTRATE JUDGE COHN** |
| | |
| **CAROLYN W. COLVIN,** | **REPORT AND** |
| **COMMISSIONER OF SOCIAL** | **RECOMMENDATION TO DENY** |
| **SECURITY,** | **PLAINTIFF'S APPEAL** |
| | |
| **Defendant.** | Doc. 1, 8, 9, 10, 11 |

## REPORT AND RECOMMENDATION

### I.   Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Defendant") denying the application of  Marjory Muhaw ("Plaintiff") for supplemental security income ("SSI") and disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"), and Social Security Regulations, 20 C.F.R. §§404 *et seq*., 416 *et seq.* (the "Regulations").[1]  Plaintiff limits her appeal to physical impairments. (Pl. Brief).

---

[1] Part 404 governs disability insurance benefit applications and Part 416 governs SSI. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Like *Sims*, these regulations "are, as relevant here, not materially different" and the Court "will therefore omit references to the latter regulations." *Id.*

In 2011, Plaintiff's primary care physician, Dr. Kraynak, opined that Plaintiff could not sit for more than two hours in an eight-hour workday or stand more than one hour in an eight hour workday. Doc. 9. The District Court remanded because no medical opinions contradicted the treating source opinion and the ALJ rejected it with only lay reinterpretation of medical evidence. Doc. 9. The ALJ ordered a consultative examination. Doc. 9. The consultative examiner observed essentially normal findings on physical examination and opined that Plaintiff could perform a range of light work. Doc. 9. The ALJ awarded disability from 2008, Plaintiff's alleged onset date, through November of 2014, when the consultative examiner opined that she could perform light work. Doc. 9. The ALJ found that Plaintiff had medically improved in November of 2014 and was no longer disabled. Doc. 9. Consequently, the only issue on appeal is whether the ALJ lacked substantial evidence to deny benefits from November 21, 2014 through March 26, 2015, the date of the ALJ decision. Doc. 9.

The ALJ relied on the 2014 consultative examination, essentially normal physical examination findings from 2013 and 2014, the lapse of time between Dr. Kraynak's 2011 opinion and Plaintiff's date of medical improvement in 2014, Plaintiff's inconsistent claims, and her conservative treatment.  Doc. 9. The Court reviews the ALJ's decision under the deferential substantial evidence standard. *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003). Substantial evidence supports the ALJ decision unless no "reasonable mind might accept [the relevant evidence] as adequate to support a conclusion." *Id.*

(internal citations omitted). "Stated differently, this standard is met if there is sufficient evidence 'to justify, if the trial were to a jury, a refusal to direct a verdict.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). Here, the Court would not direct a verdict in Plaintiff's favor. *Id.* The Court recommends that Plaintiff's appeal be denied, the decision of the Commissioner be affirmed, and the case closed.

## II.    Procedural Background

On July 6, 2009, Plaintiff applied for SSI and DIB. (Tr. 121-34). The Bureau of Disability Determination denied these applications, (Tr. 59-74) and Plaintiff requested a hearing. (Tr. 86). An ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 27-58). On March 29, 2011, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 27-58). Plaintiff requested review with the Appeals Council (Tr. 7-8), which the Appeals Council denied on September 5, 2012, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6). *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Plaintiff appealed to the District Court, and on July 30, 2014, the District Court remanded. *Muhaw v. Colvin*, No. CIV.A. 3:12-2214, 2014 WL 3743345, at *4–11 (M.D. Pa. July 30, 2014). On January 29, 2015, the ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 643-82). On March 26, 2015, the ALJ found that Plaintiff was not disabled and not

entitled to benefits after November 21, 2014, but was disabled and was entitled to benefits from December 8, 2008 to November 20, 2014. (Tr. 609-42).

On July 17, 2015, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). Doc. 1, par. 9. On September 21, 2015, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 8, 9). Defendant did not raise the issue of exhausting administrative remedies. *See Mathews v. Eldridge*, 424 U.S. 319, 328, 96 S. Ct. 893, 899, 47 L. Ed. 2d 18 (1976) (exhaustion of administrative remedies may be waived). On November 4, 2015, Plaintiff filed a brief in support of the appeal ("Pl. Brief"). (Doc. 10). On December 4, 2015, Defendant filed a brief in response ("Def. Brief"). (Doc. 11). Plaintiff did not timely file a reply. On January 11, 2016, the case was referred to the undersigned Magistrate Judge. The matter is now ripe for review.

### III.   Standard of Review and Sequential Evaluation Process

To receive DIB or SSI, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *Id*. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *Id*.  Before step four, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). *Id*.

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. See 42 U.S.C. § 423(d)(5)(A).  Specifically, the Act provides that:

An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require. An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability.

42 U.S.C. § 423(d)(5)(A); 42 U.S.C.A. § 1382c(a)(3)(H)(i).

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is "less than a preponderance" and "more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Stated differently, this standard is met if there is sufficient evidence 'to justify, if the trial were to a jury, a refusal to direct a verdict.'" *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir.

2003) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)).

## IV.   Relevant Facts in the Record

Plaintiff was born in 1967 and was classified by the Regulations as a younger individual throughout the relevant period. (Tr. 21, 629); 20 C.F.R. § 404.1563. Plaintiff has a limited education and past relevant work as a deli clerk and a video clerk. (Tr. 629). Plaintiff earned enough income to be insured[2]  through September 30, 2009. (Tr. 618).[3]After a previous remand from the District Court, the ALJ found that Plaintiff was disabled from December 5, 2008 until November 21, 2014, when she was no longer disabled because she medically improved. (Tr. 618).[1] Because Plaintiff established disability on December 5, 2008, she is entitled to a "DIB freeze" after December 5, 2008, even if she does not prevail on this appeal. Thus, if she is able to demonstrate in a subsequent application that she became disabled again before a new date last insured, likely June 30, 2015. *See Shiner v. Sullivan*, 793 F. Supp. 1257, 1263–64 (D. Vt. 1991) ("In determining a claimant's primary insurance amount according to a method such as AIME, the Secretary takes into account an additional factor. 20 C.F.R. § 404.320; see POMS, RS 00605.210. This factor is referred to by various synonyms: "period of

---

[2] Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." See 20 C.F.R. §§ 404.130-134.

disability," "disability freeze," "freeze period," or simply "freeze." The freeze can be used to exclude earnings of certain years from the computation of the claimant's average monthly earnings. 20 C.F.R. § 404.320; *Ransom*, 844 F.2d at 1331 (citations omitted); POMS, RS 00605.210(A).1011 The purpose of a freeze is to protect the worker against the loss of, or a reduction in the amount of, her disability benefits. *Ransom*, 844 F.2d at 1331 (citations omitted). Essentially, this purpose is accomplished by providing that part of the period during which she is disabled, and therefore unlikely to have substantial earnings, will not be counted against her in determining her insured status or benefit amount. *Id.*; 20 C.F.R. § 404.320; POMS, RS 00605.210(A). Moreover, the freeze is designed only to help claimants, and where a freeze computation results in a lower monthly benefit amount, this computation method will not be used. 42 U.S.C. § 420").

In the previous remand order, the District Court summarized the relevant medical records:

> Muhaw commenced receiving medical care and treatment from Dr. Kraynak in September, 2003, and continued to receive regular treatment from Dr. Kraynak through January, 2011. Tr. 454 and 541. Dr. Kraynak's treatment notes of September 4, 2003, indicate that Muhaw was working on August 12, 2003, at Advance Auto Parts in Shenandoah when she injured her back while lifting merchandise. Tr. 541. The record also reveals that Muhaw injured her back lifting a box of bacon in 2001 when working as a meat clerk. Tr. 597. Dr. Kraynak at the initial appointment in September, 2003, reported that Muhaw complained of neck pain and low back pain which radiated into both lower extremities. Tr. 541. A physical examination performed by Dr. Kraynak revealed that Muhaw had decreased range of motion of the lumbar spine with flexion 50 degrees and extension 15 degrees;[3] and Muhaw had sacroiliac joint tenderness bilaterally, positive bilateral straight leg raising tests, tenderness and pain in the right shoulder

region, limited cervical range of motion, and muscular spasms in the cervical and thoracic areas. *Id.* Dr. Kraynak's impression was that Muhaw suffered from, inter alia, a lumbar strain with aggravation of a pre-existing herniated disc. *Id.* Dr. Kraynak prescribed the narcotic pain medication Darvocet and the muscle relaxant Skelaxin; limited Muhaw to light-duty work for a two-week duration; and scheduled a follow-up appointment. *Id.*

At the follow-up appointment with Dr. Kraynak which occurred on September 18, 2003, Muhaw continued to complain of neck and low back pain and also a burning sensation in her lower extremities. Tr. 542. Muhaw reported that the Darvocet did not help. *Id.* Physical examination findings were similar to those reported by Dr. Kraynak at the appointment on September 4, 2003. *Id.* In addition, it was stated that Muhaw walked with an antalgic gait.[4] *Id.* Dr. Kraynak ordered an MRI of Muhaw's lumbar spine to rule out progression of the herniated disc, imposed work restrictions. and prescribed the narcotic pain medication Percocet. *Id.*

The MRI which was performed on September 24, 2003, revealed a "[m]inimal nonsignificant bulge at T11–12" and "[m]ild disc desiccation [loss of water content] with bulging at L4–5 and L5–S1 without evidence of focal disc herniation or spinal or foraminal stenosis." Tr. 308.

Muhaw had a follow-up appointment with Dr. Kraynak on October 14, 2003, at which Muhaw complained of severe neck and low back pain and a burning sensation in her lower extremities. Tr. 543. Physical examination findings were essentially the same as those observed at the previous appointment, including that Muhaw walked with an antalgic gait. Tr. 543. Muhaw was given a prescription for Percocet and referred to Mohammad Aslam, M.D, a neurologist for further evaluation. *Id.*

On October 28, 2003, Dr. Aslam physically examined Muhaw and performed nerve conduction studies and an electromyogram ("EMG") of Muhaw's lower extremities. Tr. 597–598. The physical examination revealed that Muhaw had limited range of motion in the lumbosacral spine with a lot of paravertebral muscle spasm and trigger point tenderness; she was tender in the upper thoracic spine area; and straight leg raising tests were moderately painful. *Id.* The results of the EMG were suggestive of an L5 radiculopathy. Tr. 598. Dr. Aslam administered nerve blocks and trigger point injections to the spine and prescribed the nonsteroidal anti-inflammatory drugs Vioxx and Naprosyn and the muscle relaxant Flexeril. *Id.* Muhaw was also advised to use a Duragesic patch. *Id.*

From November 12, 2003, through September 9, 2005, Muhaw had 19 appointments with Dr. Kraynak and continued to complain of severe low back pain and a burning sensation in her legs. Tr. 544–562. The physical examination findings essentially remained unchanged or worsened during this period of time, including Muhaw walked with an antalgic gait, and had restricted range of motion of the spine, positive straight leg raising tests, and muscle spasms and tenderness. *Id.* Notably, on September 14, 2005, there was a worsening in Muhaw's lumbar range of motion to 40 degrees of flexion and 10 degrees of extension. Tr. 558. It was also noted that her bilateral side bending was 10 degrees. *Id.* During this period Muhaw was treated with multiple medications, including the Percocet, Flexeril, Ambien, Valium, Vicodin, Avinza/Kadian (morphine sulfate), Neurontin, and Topamax. Tr. 544, 546,548, 550–552, 560 and 562.

On or shortly after the appointment of September 9, 2005, Dr. Kraynak ordered an MRI of Muhaw's lumbosacral spine which was performed on September 28, 2005, and was reported to be an "abnormal MRI of the lumbosacral spine." Tr. 502–503. The MRI revealed the following: (1) evidence of degeneration, desiccation and some signal loss in the intervertebral disc of T 11–12 along with a posterior disc bulge which indented the thecal sac posteriorly;[5] (2) minimal degenerative changes at the L4–L5 disc with a posterior bulge but no neural foramina stenosis; and (3) evidence at the L5–S1 level of degeneration, desiccation and posterior disc bulge to protrusion causing very minimal bilateral neural foramina stenosis although the nerve root seemed to be intact. *Id.*

On October 7, 2005, Muhaw had an appointment with Dr. Kraynak at which she complained of increasing pain in her low back which radiated to her lower extremities. Tr. 563. Dr. Kraynak reported that Muhaw continued to have severe limitation in her lumbar spine range of motion and spasms and tenderness in the low back. *Id.* He also stated that Muhaw's "[r]ight leg weakness is greater than left." *Id.* Dr. Kraynak continued to prescribed medications and referred Muhaw to a neurologist for an EMG and a nerve conduction study. *Id.* The electrodiagnostic testing was performed on October 24, 2005, by Michael H. Shuman, M.D., and the results were reported to be abnormal "chiefly from the EMG point of view with findings suggestive of irritation of the right lower lumbar and sacral nerve roots." Tr. 525–526.

On November 7 and December 12, 2005, and January 19, 2006, Muhaw had appointments with Dr. Kraynak. Tr. 564–566. Muhaw's complaints remained

the same and there was no significant change in Dr. Kraynak's physical examination findings from those previously reported. *Id.* Dr. Kraynak continued to prescribe various medications and there is reference to adjustments made to the medication regimen because of medication side effects. *Id.* After the examination on January 19th Dr. Kraynak referred Muhaw to a neurologist for further evaluation. Tr. 566.

On February 8, 2006, Muhaw was examined by Jonas M. Sheehan, M.D., a neurosurgeon, at the Hershey Medical Center. Tr. 601–602. Dr. Sheehan conducted a physical examination of Muhaw and reviewed the MRI scan of September 28, 2005. *Id.* The objective physical examination findings reported by Dr. Jonas were essentially normal other than Muhaw had limited strength in the quadriceps of the right lower extremity and her lumbar range of motion was limited in all directions. Tr. 602. Dr. Sheehan reported that Muhaw had negative straight leg raising tests and that she was "unwilling to toe walk but [was] able to elevate on her toes quite well on the left side and in a more limited fashion on the right." *Id.* Dr. Sheehan stated that the MRI scan revealed slight degenerative changes of the lumbar spine and "[t]here doesn't appear to be any substantial degenerative changes which would account for [Muhaw's] severe pain." *Id.* Dr. Sheehan further noted that he could not explain Muhaw's pain symptoms based on the MRI scan "aside from degenerative changes" and that her condition appeared to be a "relatively mechanical and soft tissue strain situation in her back which is likely to resolve without surgical intervention." *Id.* Dr. Sheehan stated that Muhaw's pain with respect to lumbar extension "indicate[d] possible facet arthropathy."[6] *Id.* Dr. Sheehan recommended that Muhaw be evaluated at a pain clinic. *Id.*

On February 22, May 1, and June 29, 2006, Muhaw had appointments with Dr. Kraynak. Tr. 567–569. Muhaw's physical complaints remained the same and there was no significant change in Dr. Kraynak's physical examination findings from those previously reported, including that Muhaw walked with an antalgic gait. *Id.* The treatment notes of these appointments reveal that Muhaw was also complaining of depression and Dr. Kraynak stated that "chronic pain syndrome can bring out depression." Tr. 567. Dr. Kraynak continued treating Muhaw with medications, including antidepressants and stated in the notes of the June 29, 2006, appointment that he would continue to monitor Muhaw's progress. Tr. 569. However, after this appointment, there is a gap of almost a year in the medical treatment records contained within the administrative record.

The next medical record we encounter is from May 9, 2007. Tr. 497. On that date Muhaw had an appointment with Dr. Kraynak which was referred to as a regular check-up. *Id.* At that appointment Muhaw reported that she was in a motor vehicle accident. *Id.* She stated that she was the driver; she went off the road at approximately 30 miles per hour and hit a tree; and the airbag deployed. *Id.* She stated that she was not intoxicated and she did not hit her head but reported left knee and right elbow pain and increased back pain. *Id.* A physical examination revealed positive ecchymosis (bruising) of the right elbow; decreased range of motion of the left knee with mild swelling; decreased lumbar range of motion with positive spasms; and decreased range of motion of the cervical spine. *Id.* Dr. Kraynak's diagnostic assessment was status post motor vehicle accident causing increased low back pain and right elbow and right knee contusions. *Id.* Dr. Kraynak refilled Muhaw's prescriptions. *Id.*

Muhaw had a follow-up appointment with Dr. Kraynak on July 9, 2007, at which Muhaw complained of increased pain. Tr. 496. Dr. Kraynak's diagnostic assessment was lumbar radiculitis and noted that he was waiting for the report of a recent MRI of the lumbar spine. *Id.* That MRI was performed on July 6, 2007, and was reported to be abnormal. Tr. 501. It revealed "a posterior disc protrusion to herniation at [the] L5–S1 [level] causing compression of the thecal sac in the midline and moderate bilateral nerve root canal stenosis." *Id.*

On August 14 and August 21, 2007, Muhaw received outpatient mental health counseling at The ReDCO Group, Behavioral Health Service, in Pottsville, Pennsylvania, under the supervision of Samuel Garloff, D.O., a psychiatrist. Tr. 386–388. On November 8, 2007, Dr. Garloff discharged Muhaw from the treatment program noting that Muhaw only attended two sessions. Tr. 384–385. At the time of discharge, Muhaw was diagnosed as suffering from depressive disorder, not otherwise specified, and given a Global Assessment of Functioning (GAF) score of 60.[7] Tr. 384.

Muhaw had regular monthly appointments with Dr. Kraynak on August 30 and September 27, 2007, at which she continued to complain of severe low back pain. Tr. 494–495. Dr. Kraynak physical examination findings were essentially the same as previously reported, including Muhaw walked with an antalgic gait and had limited range of motion in the lumbar spine. *Id.* The treatment note of September 27, 2007, specifically indicates that Muhaw was suffering from a herniated nucleus pulposus at the L5–S1 level of the lumbar spine and she had limited activities of daily living. Tr. 494.

On November 17, 2007, Muhaw was evaluated by David F. O'Connell, Ph.D., a clinical psychologist, on behalf of the Bureau of Disability Determination. Tr. 256–260. After conducting a clinical interview and mental status examination, Dr. O'Connell's Axis I diagnostic assessment was that Muhaw suffered from depressive disorder, not otherwise specified, with some symptoms of bipolar disorder; panic disorder without agoraphobia; and generalized anxiety disorder. *Id.* Dr. O'Connell noted that Muhaw's mood was "one of moderate anxiety, profound depression." Tr. 258. Dr. O'Connell's Axis I I diagnostic assessment was "avoidant personality features." He gave Muhaw a GAF score of 31, representing a major impairment in several areas such as thinking or mood. Tr. 259.

From November 21, 2007 through November 12, 2008, Muhaw had 14 appointments with Dr. Kraynak at which Muhaw continued to complain of low back pain. Tr. 279–283, 286–292 and 539–540. Also, at some of these appointments Muhaw complained of neck pain, anxiety and depression. *Id.* The physical examination findings were very similar to those previously reported. *Id.* It was repeatedly stated that Muhaw walked with either an antalgic or stiff gait and she had decreased lumbar range of motion accompanied by muscular spasms and tenderness. *Id.* Dr. Kraynak repeatedly diagnosed Muhaw as suffering from lumbar radiculitis, anxiety and depression and prescribed multiple medications. Tr. 279–283, 286–292 and 539–540.

The first appointment that Muhaw had with Dr. Kraynak after the alleged disability onset date of December 5, 2008, was on December 11, 2008. Tr. 284. That appointment was primarily to address an upper respiratory infection. *Id.* However, Dr. Kraynak did note that Muhaw walked with an antalgic gait. *Id.* Dr. Kraynak's diagnostic assessment was that Muhaw suffered from bronchitis, lumbar radiculitis and anxiety and he continued to prescribed medications, including Percocet and Xanax. Tr. 284 and 579. At the next appointment with Dr. Kraynak on January 12, 2009, Muhaw continued to complain of low back pain and anxiety. Tr. 276. Dr. Kraynak reported that Muhaw walked with an antalgic gait and had decreased range of motion in the lumbar spine accompanied by muscular spasms. *Id.* Muhaw was prescribed medications, including Xanax and Percocet. *Id.*

On January 13, 2009, Muhaw had an appointment with Myra B. Tolan, M.D., at the Geisinger Medical Center in Danville, Pennsylvania, based on a referral from Dr. Kraynak. Tr. 266–267. Although the record of this appointment states that it is a followup visit, our review of the administrative

record did not reveal any other treatment records from Dr. Tolan. Dr. Tolan reports that Muhaw had a history of lower back pain and that she injured her back while employed for Advance Auto Parts. *Id.* She further noted that Muhaw was working as a cook[8] and that she settled a Worker's Compensation claim but unfortunately continued to have lower back pain. *Id.* Muhaw at this appointment complained of low back pain radiating into the right lower extremity. *Id.* The results of a physical examination performed by Dr. Tolan were essentially normal, including Muhaw "ambulate[d] with a nonantalgic gait." *Id.* Dr. Tolan in the report of this appointment also commented on an MRI of the lumbar spine of December 16, 2008. *Id.* She stated that it revealed mild degenerative changes and no significant canal or foraminal stenosis. *Id.* Our review of the administrative record did not reveal a report of this MRI. Dr. Tolan's diagnostic impression was "[m]ild lumbar degenerative disk disease with history of lumbar strain." *Id.* Dr. Tolan prescribed the nonsteroidal anti-inflammatory medications diclofenac and Voltaren gel (topical diclofenac) for Muhaw's lower back and prescribed the antidepressant drug Pamelor to commence two weeks after initiating diclofenac if Muhaw did not have sufficient relief. *Id.*

From February 9, 2009, through May 26, 2010, Muhaw had 19 appointments with Dr. Kraynak at which Muhaw continued to complain of low back pain. Tr. 272–275, 277–278, 285, 458–463, 468–471 and 489–490. Also, at some of these appointments Muhaw complained of anxiety, depression, sleep difficulties, fatigue and excessive daytime sedation. *Id.* The physical examination findings were very similar to those previously reported. *Id.* It was repeatedly stated that Muhaw walked with either an antalgic or stiff gait and she had decreased lumbar range of motion accompanied by muscular spasms and tenderness. *Id.* On three occasions Dr. Kraynak specifically noted that Muhaw had positive straight leg raise tests in both lower extremities. Tr. 272, 458 and 462. Dr. Kraynak repeatedly diagnosed Muhaw as suffering from degenerative joint disease of the spine, lumbar radiculitis and anxiety and prescribed multiple medications. Tr. 272–275, 277–278, 285, 458–463, 468–471 and 489–490. Also, on October 19, 2009, Dr. Kraynak's diagnostic assessment was that Muhaw suffered from chronic pain syndrome and prescribed Savella. Tr. 489.

On January 13, 2010, at the request of Dr. Kraynak, Muhaw was examined by Glenn A. Miller, a physicians assistant at the Hershey Medical Center, apparently in presence of Vagmin P. Vora, M.D. Tr. 504–506. The physical examination performed by Mr. Miller revealed that Muhaw ambulated with

a normal gait without the use of a cane or walker; Muhaw was able to walk on her heels and toes without difficulty; Muhaw had negative straight leg raising tests bilaterally; Muhaw's reflexes in the lower extremities were normal (2+); she had normal strength and sensation in the lower extremities; she was able to forward bend 45 degrees until she begin to have lumbar discomfort; she had increased lumbar discomfort with extension; and she was tender to palpation over the L5–S1 area. Tr. 505. The assessment was that Muhaw suffered from low back pain and it was recommended that she begin physical therapy and continue receiving medications through Dr. Kraynak. *Id.*

On March 18, 2010, Muhaw was again examined at Hershey Medical Center at the request of Dr. Kraynak. Tr. 508–510. The examination was performed by Marek Kurowski, M.D., and revealed that Muhaw's range of motion with respect to lumbosacral extension was extremely limited and produced acute lower back pain. Tr. 509. The examination also revealed red papules visible on Muhaw's shins, elbows, and stomach; she had tenderness to palpation at the L4–L5 and L5–S1 levels of the lumbosacral spine; she had tenderness in the region of the right paraspinal muscles at the L5–S1 level overlying the facet joints; she had tenderness in the right sciatic notch; and there were palpable trigger points lateral to the right PSIS (posterior superior iliac spine). *Id.* Otherwise, the results of the physical examination were normal. *Id.* Dr. Kurowski's diagnostic assessment was that Muhaw suffered from "[c]hronic, long-standing, axial low back pain with a coexisting diagnosis of psoriasis" and "[p]ossible facet degeneration contributing to the axial low back pain as per examination." *Id.* Dr. Kurowksi recommended medial branch block injections at the right lumbar facet joints of L3, L4 and L5 levels of the lumbar spine. Tr. 510.

On May 26, 2010, Dr. Kraynak noted that Muhaw had a mild decrease in her lower extremity strength and positive bilateral sacroiliac tenderness in addition to walking with an antalgic gait, muscular spasms, lumbar tenderness and decreased lumbar range of motion. Tr. 458. With respect to the diagnostic assessment, Dr. Kraynak stated that Muhaw suffered from lumbar radiculitis and had increased lower extremity symptoms and increased low back pain. *Id.* Dr. Kraynak refilled Muhaw's prescription for Percocet and ordered an MRI of Muhaw's lumbar spine. *Id.*

The MRI was performed on June 15, 2010, and was significantly different from the prior MRI reports. Tr. 498–499. It reported (1) cysts in the neural canals as well as cystic dilatations of the nerve root sleeves at several levels

of the lumbar spine;[9] (2) at the L4–L5 level a right sided disc protrusion that significantly compresses the right anterior aspect of the thecal sac and partially effaces the perineural fat bilaterally; and (3) at the L5–S1 level a broad based disc protrusion which impinges upon but does not compress the thecal sac. *Id.* The MRI also revealed degenerative vertebral body endplate changes anteriorly at the L3–L4 level associated with small anterior vertebral endplate osteophytes (spurs). *Id.* The conclusion of the MRI report stated that there were abnormal protrusions of the degenerative discs at the L3–L4, L4–L5 and L5–S1 levels as described and a very mild spinal stenosis at L3–L4 and L4–L5. Tr. 499. The ALJ did not mention this MRI report in her decision.

From June 23, 2010 through January 6, 2011, Muhaw had 8 appointments with Dr. Kraynak at which Muhaw continued to complain of low back pain with radiation of the pain to the lower extremities. Tr. 454–457 and 464–467. Also, at some of these appointments Muhaw complained of neck pain, anxiety, depression, sleep difficulties and fatigue. *Id.* The physical examination findings were very similar to those previously reported. *Id.* It was reported that Muhaw walked with either an antalgic or stiff gait and she had decreased lumbar range of motion accompanied by muscular spasms and tenderness. *Id.* Also, on one occasion Dr. Kraynak specifically noted that Muhaw had positive straight leg raising tests in both lower extremities. Tr. 464. Dr. Kraynak repeatedly diagnosed Muhaw as suffering from degenerative joint disease of the spine, lumbar radiculitis and anxiety and prescribed multiple medications. Tr. 454–457and 464–467.

On September 27, 2010, Muhaw was examined at the request of Dr. Kraynak by Llewelyn A. Williams, M.D., at the Shamokin Area Community Hospital, Coal Township, Pennsylvania. Tr. 393–394. The objective physical examination findings reported by Dr. Williams were essentially normal other than significantly decreased lumbar flexion, some sacroiliac joint tenderness and some decreased motor strength bilaterally in the lower extremities. Tr. 393. The diagnostic impression was that Muhaw suffered from chronic pain syndrome and L5–S1 radiculopathy.Tr. 394. Dr. Williams recommended lifestyle changes, including smoking cessation, and physical therapy. *Id.*

On December 1, 2010, at the request of Dr. Kraynak, Muhaw was examined at the Shamokin Area Community Hospital by Patrick T. Konitzer, M.D. Tr. 390–392. A physical examination revealed minimal cervical paraspinal tenderness to palpation; some pain beyond 20 degrees of lumbar flexion; a straight leg raise examination was difficult to perform on the right because

the right leg would tighten up; and there was a positive Patrick's sign on the right.[10] Tr. 391. Otherwise, the results of the physical examination were essentially normal. *Id.* The diagnostic assessment was that Muhaw suffered from chronic low back pain and lumbosacral radicular pain as well as possible right-sided sacroiliitis. *Id.*

On January 17, 2011, Dr. Kraynak completed a medical source statement of Muhaw's worked-related functional abilities. Tr. 401–408. Dr. Kraynak limited Muhaw to less than the sitting, standing, walking, lifting and carrying requirements of full-time sedentary work. *Id.* Dr. Kraynak stated that the limitations that he assessed existed as of January 1, 2005. Tr. 407. Dr. Kraynak further stated that his assessment was based on, inter alia, Muhaw's medical history, clinical findings and laboratory and diagnostic testing. Tr. 401. The vocational expert who testified at the administrative hearing indicated that if Dr. Kraynak's limitation were accepted as an accurate reflection of Muhaw's functional ability that Muhaw could not perform any of the jobs which she identified in response to the ALJ's hypothetical questions. Tr. 56. The administrative record does not contain a medical source statement of Muhaw's work-related functional abilities from a state agency physician or other treating or examining physician which conflicts with Dr. Kraynak's statement.

*Muhaw v. Colvin*, No. CIV.A. 3:12-2214, 2014 WL 3743345, at *4–11 (M.D. Pa. July 30, 2014).

The transcript contains records from a dermatologist and mental health counseling in 2011, 2012, and 2013. (Tr. 844-1095). Plaintiff does not cite any of this evidence or allege that it supports her claims. (Pl. Brief); (Pl. Reply). The transcript contains no other evidence of treatment during that time. Doc. 9. In September of 2012, Plaintiff reported to her mental health counselor that she was treating with a pain management specialist. (Tr. 1012). No records from a pain management specialist from 2012 appear in the transcript. Doc. 9. Dermatology records list psoriasis, gastroesophageal reflex disease,

and ADHD as Plaintiff's only medical problems. (Tr. 849, 852, 855). Through 2012, Plaintiff denied fatigue, pain (arthralgia), and musculoskeletal symptoms. (Tr. 849, 852). In February of 2013, Plaintiff reported arthralgias and myalgia, but denied muscle weakness. (Tr. 855). Plaintiff was unable to do light therapy because of her "schedule." (Tr. 855). In March of 2013, Plaintiff explained that she would be unable to do light therapy because of her "car situation and work." (Tr. 863). Plaintiff was again denying fatigue, arthralgia, myalgia, and muscle weakness and "generally feels well." (Tr. 863); *see also* (Tr. 894, 903, 910). Plaintiff reported fibromyalgia in July of 2013, but denied arthralgia, myalgia, and weakness. (Tr. 915, 918, 934, 937, 946, 950, 959, 966). Plaintiff reported pain at mental health counseling. In October of 2011, providers observed she was walking with a cane. (Tr. 1018).

After Dr. Kraynak's January 2011 opinion, the next treatment for back pain is on December 31, 2013, when Plaintiff established care with primary care physician Dr. Joseph Zienkiewicz, D.O.  (Tr. 1104). Plaintiff explained that Dr. Kraynak refused to refill her medications after she reported that she left all her medications in Maryland. (Tr. 1104). Plaintiff reported she "[p]reviously had failed ibuprofen, naproxen, gabapentin, Lyrica, and multiple narcotic medications including morphine, fentanyl patch. Takes Percocet for 10 mg 4 times a day, but feels that this is too much medication, it does cause some drowsiness but she has difficulty sleeping at night. Did have back injections at 1 time that seem to give temporary relief, had tried physical therapy but found no relief

from that." (Tr. 1104). Examination indicated "no joint deformities, effusion, or inflammation, no edema, no clubbing, no cyanosis…alert & oriented x 3 with fluent speech, no focal motor/sensory deficits, gait normal." (Tr. 1106). Dr. Zienkiewicz diagnosed degenerative disc disease and fibromyalgia, prescribed amitriptyline, and continued Plaintiff's Percocet at a lower dose. (Tr. 1106).

On January 28, 2014, Plaintiff reported to Dr. Zienkiewicz that the "lower dose of Percocet controls pain without excessive sedation…has done well and she is pleased with the results." (Tr. 1119). Plaintiff reported "no change in weight, no weakness, no fatigue… No joint pain or stiffness, No arthritis, No muscle pains or cramps, No joint swelling and + backache Chronic but tolerable *wi* pain meds…No fainting or blackouts, No seizures, No paralysis or focal weakness, No numbness or tingling, No tremors and No significant problems with memory…Extremities: No pain, redness or swelling on the joints…Psychiatric: No depression, No anxiety and No psychosis." (Tr. 1121). Examination indicated no abnormalities and that Plaintiff was healthy, in no distress, with no neck pain, "no joint deformities, effusion, or inflammation, no edema, no clubbing, no cyanosis." (Tr. 1121). Plaintiff reported she was "able to perform [activities of daily living] without severe limitation." (Tr. 1122). In March of 2014, Plaintiff reported fatigue, joint pain, backache, and muscle pain, and examination indicated no back tenderness and "no joint deformities, effusion, or inflammation, no edema, no clubbing, no cyanosis." (Tr. 1142). In May of 2014, Plaintiff reported increased back pain and the

Percocet was no longer effective. (Tr. 1162). Examination indicated "Normal heel walk and toe walk, without evidence of muscle weakness, some limitation of flexion paralumbar muscles bilaterally…no joint deformities, effusion, or inflammation, no edema, no clubbing, no cyanosis." (Tr. 1165). In June of 2014, Plaintiff reported something injured her eye while mowing the lawn. (Tr. 1176).

In July of 2014, Dr. Zienkiewicz noted the rheumatologist felt that Plaintiff had "more of the degenerative disc disease picture rather than fibromyalgia." (Tr. 1184). Plaintiff denied fatigue and examination was normal. (Tr. 1186). Dr. Zienkiewicz continued Plaintiff's Percocet but "did encourage her to cut back on her narcotic usage as much as practical to try and minimize the extra pain receptors that may be synthesized due to her chronic narcotic use." (Tr. 1187). On October 22, 2014, Plaintiff reported that pain management had instructed her to use four Percocet per day "without any significant constipation or sedation issues." (Tr. 1205). Examination indicated her back had  "No CVA tenderness, Range of motion is normal, Normal heel walk and toe walk, without evidence of muscle weakness, Tender paralumbar muscles bilaterally…no joint deformities, effusion, or inflammation, no edema, no clubbing, no cyanosis." (Tr. 1208).

Plaintiff met with a gastroenterologist in 2014, who noted that Plaintiff had no reported gait abnormalities and normal extremity inspection. (Tr. 1245). Plaintiff reported that she was not experiencing pain related to the visit. (Tr. 1251). In September of 2014, providers noted that she did not have classic "GERD" symptoms and Plaintiff indicated

that she would follow-up only as needed. (Tr. 1256). Plaintiff treated with a rheumatologist, who opined that there was "no evidence to suggest autoimmune etiology." (Tr. 1273). Examination indicated "no clubbing, cyanosis, or edema…grossly non-focal, cranial nerves intact, sensation to light touch intact, motor strength normal-Hands: normal-Wrists: normal-Elbows: normal-Shoulders: normal-Neck: normal-Back: lower lumbar spine tendemess+-Hips: pain on FABER and SLR + B/l-Knees: normal-Ankles: normal-Feet: normal." (Tr. 1273).

On November 24, 2014, Plaintiff underwent a consultative examination with Dr. Willner. (Tr. 830-43). Plaintiff was 47 years old, and her chief complaints were non-cardiac chest pain (spasms), esophageal reflux, and lower back pain (Tr. 830). Examination indicated "claimant appeared to be in no acute distress. She has a slow, poorly balanced gait. Can walk on heels and toes without difficulty. Squat full, stance normal. Used no assistive devices. Needed no help changing for exam or getting on and off exam table. Able to rise from chair without difficulty." (Tr. 831). Chest and abdomen examination was normal. (Tr. 832). Dr. Willner noted:

> MUSCULOSKELETAL: No scoliosis, kyphosis, or abnormality in thoracic spine. SLR negative bilaterally. No evident joint deformity. Joints stable and nontender. No redness, heat, or effusion.

> NEUROLOGIC: DTRs physiologic and equal extremities. No sensory deficit noted, upper and lower extremities. Strength 5/5 in the upper and lower extremities.

EXTREMITIES : No cyanosis, clubbing, or edema. Pulses physiologic and equal. No significant varicosities or trophic changes . No muscle atrophy evident. She had tremors in her left hand.

(Tr. 832). Plaintiff had limited range of motion. (Tr. 840-43). Plaintiff described MRI findings showing degenerative joint disease and a bulging lumbar disc. (Tr. 830). Plaintiff reported that she lived with her daughter, "performs all [activities of daily living]," and "watches TV, reads, and socializes." (Tr. 831). Dr. Willner opined that Plaintiff could frequently lift and carry up to ten pounds and occasionally lift and carry up to 20 pounds, sit for up to eight hours at one time, stand for two hours, and walk for one hour, and sit for a total of eight hours in an eight-hour workday, stand for five hours, and walk for two hours (Tr. 835). Dr. Willner opined  that Plaintiff did not require a cane to ambulate and assessed additional postural and non-exertional limitations. (Tr. 835-37).

On January 29, 2015, Plaintiff appeared and testified before the ALJ. (Tr. 653). She testified that she could not stand or sit for "too long." (Tr. 659). She elaborated that she could not sit or stand for more than twenty minutes. (Tr. 661). She testified she could lift a gallon of milk (Tr. 661). Plaintiff testified that pain medication caused "tiredness, weakness, dizz[iness], blurred vision," and sleeplessness. (Tr. 663). She testified that she did not do all of her activities of daily living, and that she relied on her daughter for help. (Tr. 663-64). She testified that she did not socialize. (Tr. 664). Plaintiff testified that she stopped seeing Dr. Kraynak because "he was a good doctor, but I thought to myself, maybe it's time I see somebody new that maybe could help me more, give me more

options." (Tr. 667). The ALJ then questioned her regarding Dr. Kraynak's refusal to refill prescription medications, and she explained "I went with my boyfriend down to Maryland for Thanksgiving. I got back, I left my prescription down there. I couldn't bring the prescription in. I said to him I'm not driving all the way to Maryland. I'm surely not having somebody send the medication in the mail. Well he copped an attitude with me and everything else and didn't want me as his clientele anymore either. So I said, well, it's about time I found new anyway because even my daughter and my son both said to me, mom, you've been seeing this doctor for how long? What is he doing for you?." (Tr. 667). Plaintiff testified that she was pleased with Dr. Zienkiewicz. (Tr. 667). Plaintiff testified that her condition had either remained the same  or gotten worse since 2009. (Tr. 670). Plaintiff testified that she had never had back surgery. (Tr. 672). A VE appeared and testified that, if Dr. Willner's RFC were adopted, Plaintiff could perform her past work as a video clerk. (Tr. 677). The VE testified that if Plaintiff was limited to a range of sedentary work, there were other jobs in the economy that she could perform. (Tr. 678).

On March 26, 2015, the ALJ found that, as of November 21, 2014, Plaintiff had the RFC to perform:

> Light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that claimant was capable of lifting and carrying 20 pounds on an occasional basis and 10 pounds on a frequent basis. Claimant is capable of standing and walking 6 out of 8 hours of a work day, and sitting 8 hours in a workday. She should never reach overhead. Claimant would be capable of frequent pushing and pulling with the bilateral upper extremities. She should never climb ropes, ladders or scaffolds or balance, but would be capable of occasionally climbing ramps and stairs, stooping, kneeling, crouching and

crawling. She should avoid all exposure to unprotected heights, but may occasionally be exposed to moving machinery, environmental irritants such as fumes and pulmonary irritants, humidity, wetness, and temperature extremes.

(Tr. 633). The ALJ relied on the VE testimony and found that Plaintiff could perform other work in the national economy. (Tr. 637).

## V.    Plaintiff Allegations of Error

### a.  Medical Improvement

Plaintiff asserts that the ALJ erred in finding that Plaintiff had medically improved. (Pl. Brief at 2). Plaintiff asserts that the ALJ mischaracterized the record regarding Plaintiff's decreased use of narcotic pain medication. (Pl. Brief at 2). However, whether the alleged error is "harmless depends on whether the other reasons cited by the ALJ in support of her…determination provide substantial evidence for her decision." *Brumbaugh v. Colvin*, 3:14-CV-888, 2014 WL 5325346, at *16 (M.D. Pa. Oct. 20, 2014). The Court concludes that Dr. Willner's consultative examination, dearth of abnormalities on physical examination in 2013 and 2014, and the overall inconsistency of Plaintiff's claims provides substantial evidence for the ALJ's finding that Plaintiff had improved. *Infra.*

Plaintiff asserts that the ALJ erred in crediting Dr. Willner's 2014 consultative examination over Dr. Kraynak's 2011 opinion. (Pl. Brief at 2). Plaintiff notes that the ALJ relied on Dr. Kraynak's opinion for the period from 2011 to November of 2014, but

rejects it regarding the period after 2014. (Pl. Brief at 2). The ALJ addressed this discrepancy, writing:

> Although his assessment and opinions were credible during the closed period, subsequent treatment notes and exam findings by other physicians including a consultative examiner, indicate an increase in functioning. As such, Dr. Kraynak's 2011 assessment and opinions are no longer credible or supported by the evidence of record. Further, Dr. Kraynak discharged claimant from *his* care and no longer conducts examinations of the claimant (Exhibit 21F).

(Tr. 634). The time lapse demonstrates that the ALJ reasonably relied on Dr. Kraynak for the period of time contemporaneous with his opinion, when no other opinion contradicted Dr. Kraynak, and rejected Dr. Kraynak's opinion for the period almost four years after the opinion. *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003). Plaintiff cites medical records from 2011 and before, but no subsequent records. (Pl. Brief at 3-9, 12).

Plaintiff asserts that the ALJ erred in assigning less than controlling weight to Dr. Kraynak's opinion for the period after November 21, 2014. (Pl. Brief at 11). However, the ALJ may only assign controlling weight if there is no substantial inconsistent evidence. *See* 20 C.F.R. §404.1527(c)(2). Dr. Willner's opinion provides substantial inconsistent evidence. *See Gober v. Matthews*, 574 F.2d 772, 777 (3d Cir. 1978)("an administrative law judge is free to…choose between properly submitted medical opinions"). The Third Circuit has held that lay reinterpretation of medical evidence is not substantial. *See Burns v. Colvin*, No. 1:14-CV-1925, 2016 WL 147269 (M.D. Pa. Jan. 13, 2016) (internal citations omitted). Here, the ALJ did not need to undertake lay

reinterpretation of the medical evidence because the ALJ relied on Dr. Willner's opinion. (Tr. 632-36). Plaintiff cites *Morales*, but *Morales* is distinguishable because it involved a non-examining, non-treating source. Plaintiff cites medical records from 2011 and before, but no subsequent records. (Pl. Brief at 3-9, 12). However, Plaintiff does not identify any case where the Third Circuit held that a contradictory examining opinion was not substantial. (Pl. Brief).

Plaintiff asserts that Dr. Willner's opinion is flawed because he did not review Plaintiff's MRIs. (Pl. Brief at 2). However, Dr. Willner noted Plaintiff's report of abnormalities on MRI. (Tr. 830). Moreover, the issue is not whether Plaintiff had an underlying spine impairment. *See* 20 C.F.R. §404.1529. The issue is the intensity, persistence, and limiting effects of the symptoms arising out of the underlying spine impairment. *Id.* Dr. Willner observed that, despite abnormalities, Plaintiff was walking on heels and toes without difficulty; squatting full; normal stance; using no assistive device; needing no help on/off exam table; no scoliosis, kyphosis or abnormality in the thoracic spine; straight leg raise testing negative bilaterally; no evident joint deformity; joints stable and non-tender; no effusion; DTRs physiologic and equal in the upper and lower extremities; no sensory deficit noted; strength 5/5 in the upper and lower extremities; no edema or cyanosis in the extremities; and no muscle atrophy evident. (Tr. 632, 831-32). Dr. Willner's failure to review MRIs does not demonstrate that no reasonable person

would have relied on Dr. Willner's opinion. *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d

Cir. 2003).

Plaintiff does not address other rationales by the ALJ for crediting Dr. Willner's

opinion. (Pl. Brief). The ALJ wrote:

> The undersigned gives great weight to this assessment by the consultative
> examiner, as it is consistent with the evidence of record and supportive of
> the residual functional capacity described above. Exam findings are non-
> focal with no significant neurological motor/sensory deficits. His opinion
> and assessment are consistent with his benign exam findings, and exam
> findings of claimant's new primary care physician (Exhibit 21F) and
> examining rheumatologist (Exhibit 23F). Relevant exam findings by the
> consultative examiner include: walking on heels and toes without difficulty;
> squatting full; normal stance; using no assistive device; needing no help
> on/off exam table; no scoliosis, kyphosis or abnormality in the thoracic
> spine; straight leg raise testing negative bilaterally; no evident joint
> deformity; joints stable and non-tender; no effusion; DTRs physiologic and
> equal in the upper and lower extremities; no sensory deficit noted; strength
> 5/5 in the upper and lower extremities; no edema or cyanosis in the
> extremities; and no muscle atrophy evident (Exhibit 17F).

(Tr. 634). This is an accurate characterization of the record. (Tr. 830). Subsequent records

indicate that through 2012, Plaintiff denied fatigue, pain (arthralgia), and musculoskeletal

symptoms. (Tr. 849, 852). Dr. Zienkiewicz treated Plaintiff with only narcotic pain

medications. (Tr. 1119). Dr. Zienkiewicz observed "some limitation" in lumbar flexion in

May of 2014 and tenderness in October of 2014, but examinations in December of 2013,

January of 2014, March of 2014, June of 2014, and July of 2014 were normal. (Tr. 1106,

1121, 1142, 1165, 1176, 1186, 1208). Gastroenterologists noted that Plaintiff had no

reported gait abnormalities and normal extremity inspection. (Tr. 1245). Rheumatology

examination indicated only tenderness in the back with pain on movement in the hips and positive straight leg raise, with "no clubbing, cyanosis, or edema…grossly non-focal, cranial nerves intact, sensation to light touch intact, motor strength normal-Hands: normal-Wrists: normal-Elbows: normal-Shoulders: normal-Neck: normal…Knees: normal-Ankles: normal-Feet: normal." (Tr. 1273). Plaintiff does not address any of the treatment records after 2011. (Pl. Brief).

When the Commissioner does not give a treating "opinion controlling weight under paragraph (c)(2) of this section, [the Commissioner] consider[s] all of the following factors in deciding the weight we give to any medical opinion." 20 C.F.R. § 404.1527(c). Specifically, "[w]hen [the Commissioner does] not give the treating source's opinion controlling weight, [the Commissioner] appl[ies] the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of [Section 404.1527], as well as the factors in paragraphs (c)(3) through (c)(6) of [Section 404.1527]in determining the weight to give the opinion." 20 C.F.R. § 404.1527(c)(2). Section 404.1527(c)(2)(i) provides that, "the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion." *Id*. Section 404.1527(c)(2)(ii) provides that "more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories." Id. Section

404.1527(c)(1) provides that, "[g]enerally, [the Commissioner] give[s] more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." Id. Pursuant to 20 C.F.R. §404.1527(c)(3), "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion" and "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion." Pursuant to 20 C.F.R. §404.1527(c)(4), "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." Pursuant to 20 C.F.R. §404.1527(c)(5), more weight may be assigned to specialists, and 20 C.F.R. §404.1527(c)(6) allows consideration of other factors which "tend to support or contradict the opinion." Consequently, the ALJ's rationale that Dr. Willner's November 2014 opinion was better supported and more consistent for the period after November 2014 than Dr. Kraynak's opinion are explicitly endorsed by the Regulations. *See* 20 C.F.R. §404.1527(c).

Plaintiff notes that she testified to greater limitations than Dr. Willner or the ALJ assessed. (Pl. Brief at 3). Plaintiff asserts that Dr. Willner's opinion is "suspicious at best" because it occurred during a time when she testified and reported that she was having greater pain. (Pl. Brief at 13). Inconsistencies between a medical opinion and subjective claims are not suspicious when the ALJ properly finds subjective claims are not fully credible. Here, the ALJ properly rejected her credibility based on the objective

medical evidence, as interpreted by Dr. Willner, her conservative treatment, and the overall inconsistency of her claims. (Tr. 632-36). Plaintiff does not directly address the ALJ's credibility findings. (Pl. Brief). Conservative treatment and lack of physical examination findings are both permissible rationales and accurate characterizations of the record. *See* SSR 96-7p.

The ALJ also properly relied on the overall inconsistency of Plaintiff's claims, such as with medication side effects. (Tr. 636). "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7P.   For instance, Plaintiff reported to Dr. Willner that she socializes,  performs all of her activities of daily living, reads, and watches television. (Tr. 632, 831). Two months later, Plaintiff testified to the ALJ that she did not socialize, relied on her daughter to perform several activities of daily living, and had no hobbies. (Tr. 663-64). Plaintiff's testimony also contradicts her reports to Dr. Zienkiewicz, such as in March of 2014, when she reported that she was able to perform activities of daily living without severe limitation despite back pain, and June of 2014, when she reported that she continued mowing the lawn. (Tr. 1122, 1176). In October of 2014, Plaintiff reported to treating providers that she was taking pain medication "without any significant constipation or sedation issues" (Tr. 1205) but testified to the ALJ three months later that pain medication caused "tiredness, weakness, dizz[iness]," blurred vision," and sleeplessness. (Tr. 663).

Similarly, Plaintiff cites the Third-Party Function Report, but does not address the ALJ's rationales for finding that report less than fully credible. (Pl. Brief at 11). The ALJ explained that the Third-Party Function Report was consistent with the record only through November of 2014. (Tr. 622). As discussed above, the ALJ properly found that the evidence from after November of 2014 contradicted Plaintiff's claims of disabling impairments. *Supra*. For the same reasons, the ALJ properly found that the evidence from after November of 2014 contradicted the Third-Party Function Report.

The ALJ is entitled to deference with regard to credibility determinations. *See Szallar v. Comm'r Soc. Sec.*, No. 15-1776, 2015 WL 7445399, at *1 (3d Cir. Nov. 24, 2015) ("the ALJ's assessment of his credibility is entitled to our substantial deference") (citing *Zirnsak v. Colvin*, 777 F.3d 607, 612–13 (3d Cir.2014)). Moreover, "[n]either the district court nor this court is empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing *Early v. Heckler*, 743 F.2d 1002, 1007 (3d Cir.1984)); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir.2011) ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations" (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

Plaintiff notes that she produced objective evidence of underlying impairments. (Pl. Brief at 11). However, the only evidence supporting her claim that these impairments caused disabling limitations was her testimony. Doc. 9. As discussed above, the ALJ

properly found that her testimony was not fully credible and relied on Dr. Willner's opinion regarding the limiting effects of her impairments.

Plaintiff notes that she was diagnosed with a degenerative disease, but that does not mean she could not demonstrate improvement. (Pl. Brief at 12). The underlying degeneration might not improve, but physical function could improve. For instance, muscle strengthening through physical activity or activities of daily living could mitigate pain. Plaintiff notes that the District Court previously remanded the case because no medical opinion contradicted Dr. Kraynak's opinion. (Pl. Brief at 12). Now, however, there is a contradictory medical opinion that provides substantial evidence for the ALJ's finding. Doc. 9.

Plaintiff notes that "a single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence." (Pl. Brief at 13) (quoting *Mason*, 994 F.2d at 1064). Here, the ALJ did not ignore counterveiling evidence and resolved evidentiary conflicts. Doc. 9. Moreover, Dr. Willner's opinion was combined with the absence of findings on physical examination after 2013, conservative treatment, and the overall inconsistency of Plaintiff's claims. *Supra*. Aside from arguing that Dr. Willner was unable to review MRIs and his opinion contradicted Plaintiff's subjective claims, Plaintiff provides no reason why the ALJ could not rely on Dr. Willner. (Pl. Brief). Substantial evidence supports the ALJ's RFC after November 21, 2014. The Court does not recommend remand on these grounds.

## VI.    Conclusion

The Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503. Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence requires "more than a mere scintilla" but is "less than a preponderance." J*esurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Here, a reasonable mind might accept the relevant evidence as adequate.    Accordingly, it is HEREBY RECOMMENDED:

I.    This appeal be DENIED, as the ALJ's decision is supported by substantial evidence; and

II.    The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28

U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: September 30, 2016                s/Gerald B. Cohn
                                      GERALD B. COHN
                              UNITED STATES MAGISTRATE JUDGE